**UNITED STATES of America,**
**Plaintiff,**

v.

**Steven BROOKS, Defendant.**

**No. CR. 98–00591SOM.**

United States District Court,
D. Hawaii.

Aug. 15, 2000.

Beverly Wee Sameshima, Assistant U.S. Attorney, Office of the United States Attorney, Honolulu, HI, for plaintiff.

T. Stephen Leong, Honolulu, HI, for petitioner.

### ORDER DENYING PETITIONER SIL-VA BROOKS' PETITION PURSU-ANT TO 21 U.S.C. § 853

MOLLWAY, District Judge.

Petitioner Silva Brooks claims an interest in part of the real property that is the subject of a forfeiture order. The forfei-

ture to the government resulted from the conviction of Silva Brooks' husband, Steven Brooks, of having knowingly and intentionally conspired to distribute controlled substances. A jury determined that the property constituted or derived from proceeds that Steven Brooks had obtained directly or indirectly as a result of the drug conspiracy.

Silva Brooks does not show under 21 U.S.C. § 853(n)(6) that she has either (1) a legal right, title, or interest in the forfeited property that vested prior to or was superior to Steven Brooks' interest at the time of the commission of the offense giving rise to the forfeiture, or (2) that she is a bona fide purchaser for value. Therefore, the court denies her petition.

### BACKGROUND

On April 18, 2000, after a two-week jury trial, Steven Brooks was found guilty of distributing in excess of 100 grams of crystal methamphetamine and conspiring to knowingly and intentionally distribute controlled substances. The following day, the jury found that the proceeds from the sale of real property located at 6312 Turnberry Circle, Huntington Beach, California, constituted or derived from drug money obtained directly or indirectly through the conspiracy.

The Turnberry Circle property had been the home of Steven and Silva Brooks and their children. Purchased in 1996, the property had been held as community property by Steven and Silva Brooks. The purchase price of the property was $690,000, and Steven and Silva Brooks made a down payment through several checks totaling $117,727.77. The first payment was a check written on the Brooks' personal account by Steven Brooks in the amount of $10,000. *See* Trial Exhibit 63. The second payment was a cashier's check in the amount of $8,600 purchased by Steven Brooks from Bank of America on September 20, 1996. *See* Trial Exhibit 68. The third payment was a cashier's check purchased with a check written by Steven

Brooks on the Brookses' personal account made payable to cash in the amount of $99,127.77. *See* Trial Exhibit 67. The balance of the purchase price consisted of a first mortgage loan of $517,500 from Coast Federal Bank, and a purchase money mortgage of $69,000 held by the seller, James Darling.

At trial, the government argued that Steven and Silva Brooks had no legitimate source for the substantial funds needed to purchase the Turnberry Circle property. In 1995 and 1996, both Steven and Silva Brooks worked at Landmark Telecommunications, Inc., the company Steven Brooks had started. In 1995, neither Steven nor Silva Brooks received compensation from Landmark, and they filed no personal income tax return. *See* Trial Exhibit 78. In 1995, Landmark had net profits of $49,920. *See id.* In 1996, neither Steven nor Silva Brooks drew a salary from Landmark, but Steven Brooks claimed, on the Brookses' personal income tax return, to have received a dividend of $140,000 from Landmark. *See id.* Landmark's tax return for 1996 did not reflect this dividend payment and showed a net profit of $62,245. *See id.*

On April 20, 2000, as a result of the jury's findings, this court issued its Preliminary Order of Forfeiture. It was published in the Honolulu Star–Bulletin on May 9, 2000, May 16, 2000, and May 23, 2000. It was also published in the Garden Grove Journal on May 18, 2000, May 25, 2000, and June 1, 2000. Copies were faxed to Milton Grimes and Keith Shigetomi, Steven Brooks' counsel, on April 24, 2000.

Thirty days passed without the filing of any claim to the property, and the court entered a Final Order of Forfeiture on July 5, 2000.

On July 14, 2000, the court received a letter from Silva Brooks claiming an interest in the Turnberry Circle property. The government, which had apparently failed to send her a copy of the Preliminary Order, does not object to Silva Brooks' belated petition.

On August 14, 2000, this court held an evidentiary hearing. The parties stipulated to certain facts, and testimony was also received from Silva Brooks and Jason Pa, an agent with the Internal Revenue Service's Criminal Investigation Division.

The parties stipulated that Silva Brooks was born on February 19, 1978, and that she met Steven Brooks between December 1993 and January 1994. In November 1994, at the age of 16, she became pregnant, married Steven Brooks, and dropped out of high school.

According to Silva Brooks, she began working for Landmark in January 1995. She says that she and Steven Brooks had agreed that all of her earnings would be reinvested in Landmark and would later be withdrawn to purchase a family home. The agreement was allegedly oral, and there was no evidence of any other contract terms. There are no corporate minutes, records, documents, or other evidence corroborating the alleged agreement. No W–2 or 1099 form was issued to Silva Brooks by Landmark in 1995, even though Landmark issued W–2s to several other Landmark employees. According to Landmark's corporate tax return, Landmark paid no wages or compensation to its officers in 1995. Steven Brooks is listed on the corporate tax return as its president, and Silva Brooks as its vice-president.

Silva Brooks says she received no wages or compensation in 1995 or 1996 but that, beginning in 1998, she was paid $4,200 a month by Landmark. She testified that she had worked just as hard in 1995 as she did in 1998. She therefore argued that,

under her alleged oral agreement with Steven Brooks, the amount of $4,200 a month for the years 1995 through 1998 had been reinvested in Landmark to be used toward the purchase of a home.[1] The only evidence that Silva Brooks earned $4,200 a month in 1998 was her own statement to that effect. She offered no W–2 form from Landmark issued in 1998. Landmark did not file a corporate tax return for 1998, and Steven and Silva Brooks did not file personal tax returns for 1998. Silva Brooks claims that her $4,200 in monthly wages was deposited directly into her personal bank account. Her Bank of America account, however, had been closed in April 1997. Silva Brooks claims that the couple's personal bank account was moved to Wells Fargo, but no Wells Fargo bank statements were provided to the court.[2] Given this state of the evidence, the court finds that Silva Brooks has not shown that she would have been paid $4,200 a year from 1995. Indeed, assuming Silva Brooks would have been paid from the funds Landmark listed as its net profits for 1995, Silva Brooks could not have been paid $4,200 a month in 1995 as the net profits were insufficient to cover that amount.

There are no documents suggesting that Silva Brooks was owed anything by Landmark. Just as there are no documents relating to her undisbursed wages, there are no documents relating to any loan by her to Landmark or to any shares issued to Silva Brooks as a form of compensation. No evidence was submitted linking any funds used for the down payment for the Turnberry Circle property specifically to Landmark.

1. Silva Brooks' argument assumes that no taxes would have been withheld from her wages, and that all of the money could have been saved, even though the couple did not have other taxable income in 1995.

2. Silva Brooks claims that she does not have her Wells Fargo bank statements because they were seized by the government. Jason Pa disputes this allegation, saying that the government seized only Landmark's corporate records pursuant to court order. This court

notes that, even if the government seized Silva Brooks' personal records, she could have obtained copies of her own bank records directly from the bank. Similarly, she could have obtained copies of her tax records directly from the Internal Revenue Service. Neither she nor her privately retained counsel gave any indication that any attempt was made to obtain such evidence. The court can therefore only conclude that such evidence does not exist.

## DISCUSSION

"Under 21 U.S.C. § 853(a), the government is entitled to forfeiture of assets constituting or derived from proceeds of certain illegal drug transactions." *United States v. Messino,* 122 F.3d 427–28 (7th Cir.1997). Forfeiture under this section "is known as criminal forfeiture because the government must first convict a defendant of a drug crime and then prove by a preponderance of the evidence that the property—which had to be identified in the criminal indictment, Fed.R.Crim.P. 7(c)(2)—either constitutes or was purchased with proceeds from the crime."[3] *Id.* (citing *United States v. Simone,* 931 F.2d 1186, 1199 (7th Cir.1991)). If a jury finds the property forfeitable as drug proceeds, the court enters a preliminary order of forfeiture. *Id.* at 428. Once the property is found forfeitable, third parties may petition the court under 21 U.S.C. § 853(n) for a hearing to adjudicate their interests in the property. *Id.*

A forfeiture order requires forfeiture only of a convicted defendant's interest in the forfeited property. Third parties may avoid forfeiture of their interests in that property by satisfying the requirements of 21 U.S.C. § 853(n)(6), which provides:

(6) If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

21 U.S.C. § 853(n)(6).

Silva Brooks cannot satisfy either section 853(n)(6)(A) or section 853(n)(6)(B).

### I. *Section 853(n)(6)(A)*

A. *Silva Brooks' Interest in the Turnberry Circle Property Did Not Vest Until After the Commission of the Acts That Gave Rise to the Forfeiture.*

Under 21 U.S.C. § 853(n)(6)(A), to succeed on a third-party claim, a petitioner must show either that she had a legal interest in the property that was vested in her rather than in the defendant, or that her interest was superior to the defendant's interest in the property at the time of the commission of the illegal acts. *See United States v. Alcaraz–Garcia,* 79 F.3d 769, 773 (9th Cir.1996). From the evidence submitted by the parties, it appears that Silva Brooks has a vested interest in the Turnberry Circle property under California law, but that her interest did not vest until after the commission of the acts that gave rise to the forfeiture of the property. *See United States v. Lester,* 85 F.3d 1409, 1413 (9th Cir.1996).

Under California law, "each spouse has a vested undivided one-half interest in the community property." *Id.* at 1412. Thus, upon purchase of the Turnberry Circle property in 1996, Silva Brooks acquired a vested one-half interest in the property.

A third party claiming an interest in the property renders the forfeiture order invalid only " '[if] the right, title, or interest [in the forfeited property] was vested in the [third party] rather than the defendant *at the time of the commission of the acts*

---

**3.** In contrast, a civil forfeiture is an in rem action against the property. *United States v.*

*One Lot of U.S. Currency ($36,634),* 103 F.3d 1048, 1053–54 (1st Cir.1997).

*which gave rise to the forfeiture.'* " *Id.* at 1413 (emphasis added). Here, the acts that gave rise to the forfeiture occurred as early as August 1993, before Steven and Silva Brooks purchased the Turnberry Circle property. Because Silva Brooks was not vested at the time the acts giving rise to the forfeiture occurred, she does not meet the vesting prong of 853(n)(6)(A).

■ Silva Brooks argues that there is no evidence that the conspiracy began in 1993 and that it might have begun as late as December 1997. Steven Brooks, however, was found guilty of a conspiracy that the indictment charged had begun in August 1993 and lasted until December 12, 1997. The jury was instructed that the dates did not have to be proved precisely, and that it was enough for the government to prove that the charged acts occurred on or about the dates charged.[4] The government presented evidence at trial covering the period from the summer of 1993 until late 1997. On the present petition, the burden is on Silva Brooks, *see* 21 U.S.C. § 853(n)(6), to show that, in finding Steven Brooks guilty of the drug conspiracy, the jury found him guilty of conspiring only after he and Silva Brooks bought the Turnberry Circle property in 1996. Silva Brooks fails to meet this burden.

B. *Silva Brooks' Interest in the Turnberry Circle Property Was Not Superior to Steven Brooks' Interest.*

■ Silva Brooks argues that the second prong of section 853(n)(6)(A) is met because her interest in the Turnberry Circle property is a purchase money mortgage that is superior to Steven Brooks' interest. Silva Brooks notes, "Where a man buys land in the name of another and pays the consideration money, the land will generally be held by the grantee in trust for the person who so pays the consideration money."[5] The authority Silva Brooks cites does not appear to state the law that governs here. Moreover, it supposes that Steven Brooks bought land in Silva Brooks' name, which is not the situation here. Even if the Turnberry Circle property were held in trust for Silva Brooks, the fact that Steven Brooks paid for it with proceeds from a drug conspiracy renders the property forfeitable. *See United States v. Kennedy,* 201 F.3d 1324, 1328 (11th Cir.2000) (finding that defendant's wife had no cognizable interest under section 853(n)(6) where defendant had loaned her drug proceeds to buy a house even though she repaid him with her inheritance money). Because Steven and Silva Brooks acquired the Turnberry Circle property at the same time and with drug money, Silva Brooks does not have an interest in the property superior to Steven Brooks' interest.

II. *Section 853(n)(6)(B)*

■ Under 21 U.S.C. § 853(n)(6)(B), Silva Brooks may also claim a third-party interest in the Turnberry Circle property if she can show that she was a bona fide purchaser for value.

---

4. The following jury instruction was given:
   You will note that the indictment charges that the offense was committed "on or about" a certain date. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

5. The court is frankly at a loss to understand Silva Brooks' characterization of her interest as a "purchase money mortgage." In 1996, which is when she says her interest vested, she did not transfer that interest to Steven Brooks. Without a transfer, she could not hold a purchase money mortgage. Even if she could make a coherent argument on the subject, any purchase money mortgage would be unenforceable because it was not in writing. California's Statute of Frauds requires agreements "for the sale of real property, or of an interest therein" to be in writing. *See* Cal.Civ.Code § 1624(a)(3) ("The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged[:].... An agreement ... for the sale of real property, or an interest therein....").

Silva Brooks does not dispute that she had no income with which to purchase the Turnberry Circle Property in 1996 as she was not being paid for her work at Landmark Telecommunications between 1995 and January 1998. *See* Deposition of Silva Brooks ("Brooks Depo.") at 44, attached to United States' Memo. in Opp. *See also* Petitioner's Reply Memorandum at 6 ("Claimant worked for LTI as [its] only 'unpaid employee' for the years 1995 until she began getting paid around January 1998"). She says that she is a bona fide purchaser for value because she and Steven Brooks agreed to reinvest what would have been her wages into Landmark Telecommunications and to use corporate funds to purchase their home.[6] *See* Brooks Depo. at 44. At the hearing on this petition, Silva Brooks' counsel confirmed that the only basis upon which Silva Brooks is claiming to be a "purchaser for value" is the alleged reinvestment of her allegedly undisbursed earnings from Landmark into the home at the time it was purchased in 1996.

The jury, however, found that the property constituted or derived from proceeds obtained through the conspiracy. There is no evidence that legitimate corporate funds were used to buy the home. Even if Silva Brooks' alleged contribution of unpaid wages could be translated, based on a preponderance of the evidence, into dollars and separated out as "clean" money, she is unpersuasive in arguing that her contribution of such money made her a bona fide purchaser for value in 1996. Silva Brooks' argument would allow even a nonworking spouse who contributed to maintaining the household and family but who agreed not to be paid to be characterized as "a bona fide purchaser for value." While it might be sound policy for federal law to recognize the value of such contributions, the court has no basis for reading section 853(n)(6)(B) as so providing. Such a reading appears to this court to be at complete odds with the very words Congress used.

Because Silva Brooks has not shown by a preponderance of the evidence that she was a bona fide purchaser for value, the court denies her petition.

*CONCLUSION*

For the reasons stated above, the court DENIES Petitioner Silva Brooks' Petition Pursuant to 21 U.S.C. § 853.

IT IS SO ORDERED.

---

6. As noted earlier, Landmark's tax returns in 1995, 1996, and 1997 show no compensation paid to Silva Brooks, and no W–2s were issued for Silva Brooks. The company's net profits for 1995 were less than the undisbursed wages Silva Brooks claims she reinvested in Landmark. As no wages were paid to Steven *or* Silva Brooks in 1995 and 1996, Landmark's net profits for those years could as easily be attributable to undisbursed wages for Steven Brooks as for Silva Brooks.